# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Karen Shields, | Case No.: 2:19-cv-00934-JAD-NJK |
| Plaintiff | |
| v. | **Order Granting Summary Judgment in Favor of the Defendants and Closing this Case** |
| Credit One Bank, N.A., et al., | |
| Defendants | [ECF Nos. 75, 76] |

Plaintiff Karen Shields sues her former employers, defendants Credit One Bank, Credit One Financial, and Sherman Financial Group, LLC, (collectively, "Credit One") alleging that they terminated her position because they did not want to extend her medical leave, thereby violating the Americans with Disabilities Act (ADA).[1]  Both Shields and Credit One move for summary judgment.  Credit One contends that Shields cannot show it discriminated against her because she was not disabled and because Shields cannot prove that the legitimate, nondiscriminatory reason it proffered for terminating her is pretextual.[2]  Shields argues that there is no genuine issue of material fact as to whether she was a qualified individual with a disability, granting her an extension of leave was a reasonable accommodation, and Credit One's assertion that her role was eliminated as a part of departmental restructuring is mere pretext.[3]  Because Shields has not shown that there is a triable issue of fact as to whether Credit One's legitimate reason for eliminating her position is pretextual, I deny Shields's motion, grant summary judgment for Credit One, and close this case.

---

[1] ECF No. 16.

[2] ECF No. 76.

[3] ECF No. 75.

**Factual Background**

**I.      Credit One hires Anne Krutchik, who begins implementing personnel and procedural changes in the human resources department.**

Credit One hired Shields as a human-resources generalist in November of 2017.[4]   Several months later, it brought on Anne Krutchik to lead the HR department.[5]   Krutchik's vision of the department involved shifting from generalist positions to "very specialized roles" and senior leadership positions.[6]   She began making changes to the department upon her arrival.[7]   On the personnel front, Kimberly Barber, Shields's direct supervisor at the time, was let go in March 2018.[8]   Christyne Riggs was hired for the newly created role of director of benefits at around the same time.[9]   And Megan Lago, who had worked as a recruiting supervisor, was promoted to the new director-of-human-resources position.[10]

Krutchik began instituting procedural changes as well.[11]   One involved an effort to streamline a number of human-resources processes that were manual and paper-based at the time, something Riggs had been hired to do as she had done this for a prior employer.[12]   Riggs spent her first several weeks at Credit One working alongside Shields, who introduced Riggs to

---

[4] ECF No. 75-1 at 1, ¶ 2.

[5] ECF No. 76-9 at 3:1–6, 16:10–14.

[6] *See id.* at 23:16–19, 24:24–25:4.

[7] ECF No. 76-3 at 34:20–36:19.

[8] *Id.* at 19:20–24; ECF No. 76-9 at 20:9–22.

[9] ECF No. 76-9 at 20:9–22.   It appears that Riggs was hired in late March and began working in early April.   *See* ECF No. 76-9 at 20:13–22; ECF No. 76-12 at 5:11–12.

[10] ECF No. 76-3 at 20:23–25; ECF No. 76-10 at 3:2–10, 11:8–22, 14:12–17.

[11] ECF No. 76-3 at 35:3–18.

[12] ECF No. 76-12 at 4:1–11; 5:11–12.

key stakeholders, the benefits-orientation process, how the information from the forms was manually entered into various systems, and how to complete benefits enrollments.[13]

**II.      Shields goes on leave after undergoing a medical procedure.**

Shields was dealing with health issues at this time.  She stated that by the end of January 2018 "it was suspected" that she had bone cancer in her right arm and shoulder.[14]  She was seeing an oncologist and undergoing tests in early March, though according to texts she sent to Barber, her oncologist did not think she had cancer at that time.[15]  But she received bone-scan results in early April that, according to Shields, were concerning.[16]  And on April 10, 2018, Shields's oncologist, Dr. Ronald Hillock, scheduled a biopsy surgery for April 20, 2018.[17]

Several days after her biopsy surgery was scheduled, Shields provided Credit One with a form from Dr. Hillock's office noting that she would be unable to work until May 20, 2018, while she recovered from the procedure.[18]  She underwent the biopsy surgery on April 20, 2018, and was released from the hospital three days later.[19]  A week after the procedure, Dr. Hillock completed an ADA form in which he stated that Shields would actually need two months of leave for recovery.[20]  He also completed a separate work-summary form that noted that Shields

---

[13] *Id.* at 5:11–21, 9:17–10:9.

[14] ECF No. 75-1 at 2, ¶ 3.

[15] ECF No. 76-13 at 2–3.

[16] *Id.* at 5.

[17] *Id.*

[18] ECF No. 75-1 at 14.

[19] *Id.* at 2, ¶¶ 3–4.

[20] *Id.* at 8–9.

could return to work on June 20, 2018.[21]  Neither of those two leave requests was denied or is at issue in this case.

Krutchik also continued to implement changes within the department while Shields was out on leave.  In April of 2018, Credit One eliminated a human-resources-representative position[22] and then let go of Lago's former supervisor, Mike Young, in May.[23]  And during Shields's leave of absence, her day-to-day duties were performed by others in the HR department, including Riggs, Lago, and Vera Yanez-Tourney, who was the assistant vice present of human resources.[24]

Shields's bone-biopsy results came back in early May and, thankfully, were negative for cancer.[25]  She immediately informed Krutchik, Riggs, and others at Credit One, who all congratulated her when they learned the happy news.[26]

**III.    Shields's physician extends her leave and then Credit One eliminates her position.**

Shields underwent physical therapy throughout May and June, and continued to recover and make improvements in shoulder strength and range of motion.[27]  But as her June 20, 2018, return-to-work date approached, Shields contacted Dr. Hillock's office to request an appointment and an extension of her leave because, according to Shields, she "was still having difficulties performing basic functions."[28]  Dr. Hillock scheduled her for an appointment on July 10, 2018,

---

[21] *Id.* at 16.

[22] ECF No. 76-11 at 3.

[23] ECF No. 76-3 at 43:15–44:5; ECF No. 76-12 at 17:4–12.

[24] ECF No. 76-12 at 6:10–13, 12:18–22, 23:19–25, 25:8–10.

[25] ECF No. 76-3 at 6–11; ECF No. 76-13 at 6.

[26] *E.g.*, ECF No. 81-2 at 38, 41.

[27] ECF No. 76-17 at 6:2–22; 76-18 at 3.

[28] ECF No. 76-3 at 11:10–23.

and gave her form extending her leave through July 12, 2018,[29] though nobody from his office evaluated her at this time.[30]  Shields provided Credit One with this new leave-extension form on June 18, 2018, two days before her initial leave period expired.[31]

Several days later, Shields received a call from Yanez-Tourney asking Shields to come into the office the following day.[32]  So on June 22, 2018, Shields met with Lago and Yanez-Tourney, who informed Shields that her human-resources-generalist role had been eliminated, her duties had been distributed among other employees, and that she was being let go.[33]  It does not appear that Credit One hired anyone as a human-resources generalist after it terminated Shields.[34]

### Procedural History

Shields brings a single claim under the ADA for "[d]isability [d]iscrimination and [f]ailure to [a]ccommodate," alleging that Credit One unlawfully terminated her because it did not want to accommodate her medical-leave extension.[35]  I dismissed her suit after adopting Magistrate Judge Nancy J. Koppe's report and recommendation[36] that Shields's claim be dismissed with prejudice because she had failed to adequately allege a disability under the

---

[29] ECF No. 75-1 at 18.

[30] ECF No. 76-3 at 11:18–12:11.  Dr. Hillock later testified that as long as the total period of leave is under three months he doesn't "argue with patients" and "pretty much give[s] them what they want."  ECF No. 76-21 at 8:4–12.

[31] ECF No. 76-20.

[32] ECF No. 75-1 at 4, ¶ 20.

[33] *Id.* at 5, ¶ 23.

[34] ECF No. 76-12 at 28:13–18.

[35] ECF No. 16 at ¶¶ 26–41.

[36] ECF No. 43.

ADA.[37]  I agreed that dismissal was warranted on two separate grounds: (1) Shields's amended complaint "lacked sufficient facts" explaining her impairment and limitations during the three-week-extension period at issue, and (2) she had "fail[ed] to state facts that plausibly show[ed] any permanent or long-term effects for her impairment" and thus had not adequately alleged that her impairment was substantially limiting.[38]

The Ninth Circuit reversed in a published order.[39]  The panel first found that the "permanent or long-term effects" language, though derived from a 2010 Equal Employment Opportunity Commission regulatory definition of "disability," was inconsistent with the ADA Amendments Act of 2008.[40]  The ADAAA expressly rejected the 2008 version of the EEOC regulations, which was identical to the 2010 version, as "too restrictive."[41]  The panel noted that the new 2011 EEOC regulations "confirm[ed] that [I] . . . erred in holding that an impairment is 'substantially limiting' only if it involves 'permanent or long-term' effects,"[42]  and it held that "the actual-impairment prong of the definition of disability . . . is not subject to any categorical temporal limitation."[43]  The court then determined that Shields's allegations of her limitations during her initial leave period, when paired with her allegation that her "surgeon had concluded that her condition had not improved sufficiently by the end of those eight weeks to permit her to return to work," were sufficient to establish that she had an "impairment" that substantially

---

[37] ECF No. 49.

[38] *See id.* at 7–9.

[39] *Shields v. Credit One Bank, N.A.*¸ 32 F.4th 1218 (9th Cir. 2022).

[40] *Id.* at 1223.

[41] *Id.*

[42] *Id.* at 1224.

[43] *Id.* at 1225.

1  limited her ability to perform major life activities during the leave extension period.[44]  After

2  remand, the parties continued with discovery and both now move for summary judgment.

3                                                   **Discussion**

4  **I.    Standard for cross motions for summary judgment**

5          The principal purpose of the summary-judgment procedure is to isolate and dispose of

6  factually unsupported claims or defenses.[45]  The moving party bears the initial responsibility of

7  presenting the basis for its motion and identifying the portions of the record or affidavits that

8  demonstrate the absence of a genuine issue of material fact.[46]  If the moving party satisfies its

9  burden with a properly supported motion, the burden then shifts to the opposing party to present

10  specific facts that show a genuine issue for trial.[47]

11          Who bears the burden of proof on the factual issue in question is critical.  When the party

12  moving for summary judgment would bear the burden of proof at trial (typically the plaintiff), "it

13  must come forward with evidence [that] would entitle it to a directed verdict if the evidence went

14  uncontroverted at trial."[48]  Once the moving party establishes the absence of a genuine issue of

15  fact on each issue material to its case, "the burden then moves to the opposing party, who must

16  present significant probative evidence tending to support its claim or defense."[49]  When instead

17

18  _____

    [44] *Id.* at 1226–27.

19  [45] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

    [46] *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

20  [47] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS*

21  *60 Minutes,* 67 F.3d 816, 819 (9th Cir. 1995).

    [48] *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)

22  (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (citation and quotations
    omitted)).

23  [49] *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (citation
    omitted).

the opposing party would have the burden of proof on a dispositive issue at trial, the moving party (typically the defendant) doesn't have to produce evidence to negate the opponent's claim; it merely has to point out the evidence that shows an absence of a genuine material factual issue.[50]  The movant need only defeat one element of the claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[51]  "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them."[52]

## II.   The *McDonnell Douglas* burden-shifting framework applies to Shields's claim.

Motions for summary judgment in the employment-discrimination context—including ones for "[d]iscrimination . . . claims under the ADA"—are subject to the burden-shifting framework described in the United States Supreme Court's decision in *McDonnell Douglas Corporation v. Green* and its progeny.[53]  "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."[54]  "The facts necessarily will vary in [employment-discrimination] cases, and the

---

[50] *See, e.g., Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *Celotex*, 477 U.S. at 323–24.

[51] *Celotex*, 477 U.S. at 322.

[52] *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir. 2001)).

[53] *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

[54] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks omitted).

specification above of the prima facie proof required from respondent is not necessarily

applicable in every respect to different factual situations."[55]

The *McDonnell–Douglas* analysis involves three steps, the first of which requires the

employee to establish a prima facie case of discrimination.[56] "Establishment of a prima facie

case in effect creates a presumption that the employer unlawfully discriminated against the

employee."[57] And to establish a prima facie case of discrimination or failure to accommodate

under the ADA, a plaintiff must demonstrate that she: (1) is disabled within the meaning of the

ADA; (2) is a qualified individual able to perform the essential functions of the job with

reasonable accommodation; and (3) suffered an adverse employment action because of her

disability."[58]

Once the prima facie case has been established, "[t]he burden of production, but not

persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason

for the challenged action."[59] The plaintiff must then show that the basis was either a mere

pretext for engaging in the unlawful conduct or that the proffered explanation is unworthy of

---

[55] *McDonnell Douglas*, 411 U.S. at 802 n.13.

[56] *Id.* at 802; *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49–52 (2003) (applying *McDonnell–Douglas* standard to ADA claim).

[57] *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

[58] *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (failure to accommodate); *Nunes v. Wal–Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999) (discrimination).

[59] *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1123–24 (9th Cir. 2000); *Raytheon*, 540 U.S. at 50; *Burdine*, 450 U.S. at 254.

1    credence.[60]  She can meet this burden by presenting circumstantial evidence, which must be

2    "specific and substantial."[61]

3           Shields argues that the *McDonnell Douglas* framework does not apply to cases involving

4    "[a] termination that results from an employer failing to accommodate or continue to

5    accommodate an employee under the ADA,"[62] citing only *Humphrey v. Memorial Hospitals*

6    *Association* for this position.[63]  But the Ninth Circuit didn't discuss *McDonnell Douglas* or its

7    general applicability to unlawful-discharge claims involving accommodation allegations in

8    *Humphrey*.[64]  Its decision in *Dark v. Curry County*, on the other hand, shows that Shields's

9    categorical argument that the *McDonnell Douglas* framework is inapplicable in this context is

10   wrong.[65]  In *Dark*, an employee had brought a claim alleging that his employer "violated the

11   ADA by discharging him while refusing reasonably to accommodate his disability."[66]  The Ninth

12   Circuit ultimately reversed the district court's grant of summary judgment for the employer, but

13   did so following the *McDonnell Douglas* framework.[67]

14   _____

15   [60] *Burdine*, 450 U.S. at 256; *Reeves*, 530 U.S. at 147; *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 746 (9th Cir. 2003).

16   [61] *Coughlan v. American Seafoods Co., LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005).  The plaintiff may also provide direct evidence of such pretext, *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217,
17   1221 (9th Cir. 1998), but there is no direct evidence in this case, so I need not consider this issue.

     [62] ECF No. 81 at 20.

18
     [63] *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1140 (9th Cir. 2001).

19   [64] *Id.* at 1134–40.

20   [65] *Dark v. Curry Cnty.*, 451 F.3d 1078 (9th Cir. 2006).

     [66] *Id.* at 1082.

21
     [67] *Id.* at 1083, 1085.  The *Dark* court found that there was "a genuine issue of material fact as to
22   whether the [employer] demonstrated a legitimate, nondiscriminatory reason for [the employee's] termination" under the second step of the *McDonnell Douglas* framework and that,
23   even if the employer had gotten past that step, summary judgment would be inappropriate because the employee had "shown, by 'specific, substantial evidence,' that the [employer's] explanation was mere pretext."  *Id.*

Shields is not entirely wrong, though, as the *McDonnell Douglas* framework is not well suited for evaluating certain types of unlawful-discharge claims under the ADA with underlying accommodation allegations.[68]  Ultimately, whether a court should apply the framework hinges on whether the employer considered or relied upon the employee's disability in taking the challenged adverse-employment action.[69]  "[I]f the employer disclaims any reliance on the employee's disability in having taken the employment action," the court must use the *McDonnell Douglas* framework "to determine if the employer's reason is pretextual."[70]  But "if the employer acknowledges reliance on the disability in the employment decision, the employer bears the burden of showing that the disability is relevant to the job's requirements."[71]

*Humphrey* provides an example of the latter situation.[72]  The employee in *Humphrey* suffered from obsessive-compulsive disorder, and the "obsessive rituals" she engaged in were causing problems with tardiness and absenteeism at work.[73]  Her employer accommodated her by allowing her to have a flexible start time.[74]  But when the employee realized this accommodation "was not working," she requested the ability to work from home, which her employer denied,[75] and she was ultimately fired for absenteeism and tardiness.[76]  Because

---

[68] *US Airways, Inc. v. Barnett*, 535 U.S. 391, 396 (2002).

[69] *See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001); *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1175 (9th Cir. 1998).

[70] *Mustafa*, 157 F.3d at 1175–76 (citing *Tehan v. Metro-North Commuter R.R. Co.*, 951 F.2d 511, 514–16 (2d Cir. 1991)).

[71] *Snead*, 237 F. 3d at 1093 n.10 (citing *Mustafa*, 157 F.3d at 1176).

[72] *Humphrey*, 239 F.3d at 1138–40.

[73] *Id.* at 1130.

[74] *Id.* at 1138.

[75] *Id.* at 1138–39.

[76] *Id.* at 1139–40.

1  "conduct resulting from a disability is considered to be part of the disability, rather than a

2  separate basis for termination,"[77] and because the employee had "presented sufficient evidence to

3  create a triable issue of fact as to whether her attendance problems were caused by OCD," the

4  *Humphrey* court concluded that a reasonable jury could find a causal link between her disability

5  and termination.[78]  The court therefore did not need to determine whether the employer's

6  proffered reason was pretextual, as the employer had already stated that it relied on conduct

7  stemming from the employee's disability when deciding to terminate her.

8        Using the *McDonnell Douglas* framework would likewise be inappropriate when an

9  employer discharged the employee after determining that her disability rendered her incapable of

10  performing her essential job functions even with reasonable accommodations,[79] or when a

11  breakdown in the interactive process results in the employee's termination.[80]  There is no

12  question that the employee's disability factored into the employer's decision-making process in

13  such cases.  So the focus of the court's analysis then is not on causation but on issues like

14  whether the employer adequately engaged in the interactive process[81] or whether reasonable

15  accommodations would allow the employee to perform the essential duties of the position (and if

16  so, whether providing those accommodations would be an undue hardship for the employer).[82]

17

18  [77] *Id.* (citing *Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1086 (10th Cir. 1997)).

19  [78] *Id.* at 1140.

20  [79] *See, e.g.*, *Rosales v. Bellagio, LLC*, 811 F. App'x 438, 439 (9th Cir. 2020) (unpublished).

21  [80] *See, e.g.*, *Reza v. IGT*, 2008 WL 2048357, at *2 (D. Nev. May 12, 2008), *aff'd sub nom. Reza v. Int'l Game Tech.*, 351 F. App'x 188 (9th Cir. 2009) (finding that using the *McDonnell Douglas* burden-shifting framework was inappropriate because "the plaintiff's disability was clearly a factor in the adverse action taken by the employer").

22  [81] *See, e.g.*, *Humphrey*, 239 F.3d at 1138–39.

23  [82] *See, e.g., id.*; *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1113 (9th Cir. 2000), *vacated sub nom. on other grounds, US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).

1    But this case does not involve those types of situations and fact patterns.  The adverse-

2    employment action at issue here is Shields's termination[83] and, as she recognizes,[84] "an

3    unlawful[-]discharge claim requires a showing that the employer terminated the employee

4    because of h[er] disability."[85]  In other words, the employee "must show that the

5    adverse[-]employment action would not have occurred but for the disability."[86]  Credit One has

6    consistently disclaimed any reliance on Shields's shoulder impairment and her request for a

7    leave extension in deciding to eliminate her position and let her go.[87]  Its stated reason for

8    terminating her is not related to her conduct, and from the start Shields has taken the position that

9    that it is pretextual.[88]  So I apply the *McDonnell Douglas* framework to Shields's claim.[89]

10

### III.    Credit One proffered a legitimate, nondiscriminatory reason for Shields's termination.

11

12    Assuming without deciding that Shields has established her prima facie case, Credit One

13    has articulated a legitimate, nondiscriminatory reason for terminating Shields—its new

14

---

15    [83] Neither party has presented evidence to suggest that Credit One denied Shields's leave extension.  In fact, she was terminated *after* the start of the period covered by the extension.  *See* ECF No. 75-1 at 3, ¶¶ 11, 17–23.

16

[84] ECF No. 75 at 18.

17    [85] *Humphrey*, 239 F.3d at 1139.

18    [86] *Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019); *Head v. Glacier Nw. Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005).

19    [87] *See, e.g.*, ECF No. 76.  Credit One has also not argued that Shields was unqualified or that several weeks of additional leave would have been an unreasonable accommodation or an undue hardship.  *Id.*

20

21    [88] ECF No. 16 at 5 (alleging that the elimination of Shields's position "was nothing more than a pretext for terminating Shields while her doctor still had her on medical leave").

22    [89] *See Snead*, 237 F. 3d at 1093; *see also Higgins v. Nw. Farm Credit Servs., ACA*, 2018 WL 2050132, at *11–12 (D. Idaho May 2, 2018) (granting summary judgment on ADA claim when the plaintiff "failed to present evidence that the real reason for her discharge was a discriminatory one based on her disability or on her request for accommodation").

23

department head, Krutchik, was in the process of reorganizing Shields's department at the time, and Shields's position was eliminated as part of that reorganization.[90]  Krutchik's shift from generalized to specialized roles[91] is consistent with the elimination of Shield's "generalist" position.[92]  This process began with Krutchik's hiring in January 2018,[93] which was before even Shields knew that she needed surgery.[94]  In the months that followed, Krutchik implemented a series of changes to procedures and personnel in the department.[95]  By March 2018, Credit One had terminated Barber,[96] promoted Lago from a recruiting supervisor to the newly created role of director of human resources,[97] and hired Riggs for the new director-of-benefits.[98]  In April 2018, a human-resources-representative position was eliminated,[99] and a month later, Lago's former supervisor, Mike Young, was let go.[100]

Shields argues that this restructuring is not a legitimate reason because "if an employer was able to redistribute and eliminate an employee's position once they were put on a medical leave of absence they would do this as a matter of course in every case to get around their

---

[90] *See* ECF No. 76 at 15–17.

[91] ECF No. 76-9 at 23:16–19, 24:21–25:4.

[92] *See Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1211–12 (9th Cir. 2008).

[93] ECF No. 76-9 at 3:1–6, 16:10–14.

[94] ECF No. 76-3 at 33:19–34:1; ECF No. 76-13 at 2, 5.

[95] Shields acknowledged that Krutchik began making such changes upon her arrival.  *See* ECF No. 76-3 at 34:20–36:19.

[96] ECF No. 76-3 at 19:20–24; ECF No. 76-9 at 20:9–22.

[97] ECF No. 76-3 at 20:23–25; ECF No. 76-10 at 3:2–10, 11:8–22, 14:12–17.

[98] ECF No. 76-3 at 20:14–18; ECF No. 76-9 at 15:5–8.

[99] ECF No. 76-11 at 3.

[100] ECF No. 76-3 at 43:15–44:5; ECF No. 76-12 at 17:4–12.

1    obligation to accommodate an employee with a leave of absence."[101]   But Shields cites no

2    authority in support of this proposition, and the Ninth Circuit has recognized that the elimination

3    of a role as part of a reorganization and reduction in force can be a legitimate, nondiscriminatory

4    reason to terminate an employee who had not yet returned from disability leave when she was

5    discharged.[102]   To the extent that Shields is arguing that it is unlawful to eliminate an employee's

6    role *because* they are disabled and on leave, that goes instead to causation and pretext.  So Credit

7    One has established a legitimate, nondiscriminatory reason for terminating Shields.

8
9    **IV.    Shields fails to identify genuine material factual issues regarding whether Credit One's reason for terminating her is pretextual.**

10           "[O]nce the employer offers a legitimate, nondiscriminatory reason for the discharge, and

11   that reason disclaims any reliance on the disability, the burden shifts to the employee to

12   demonstrate that the articulated reason is a pretext for disability discrimination."[103]   A plaintiff

13   can prove pretext "by showing that the employer's proffered explanation is 'unworthy of

14   credence' because it is internally inconsistent or otherwise unbelievable, or . . . by showing that

15   the unlawful discrimination more likely motivated the employer."[104]   And she can "meet the

16

17

---

18   [101] ECF No. 81 at 20,

19   [102] *See Snead*, 237 F. 3d at 1085–86, 1093–94; *see also Seabron v. Sony Music Ent., Inc.*, 135 F.
     App'x 42, 43 (9th Cir. 2005) (unpublished) (finding that "corporate restructuring of the
20   department where [the plaintiff] worked" was a legitimate, nondiscriminatory reason for his
     termination).  In *Snead*, the Ninth Circuit was applying the *McDonnell Douglas* framework to
21   Oregon's equivalent of the ADA, but "[t]he standard for establishing a prima facie case of
     discrimination under Oregon law is identical to that used in federal law."  *Snead*, 237 F.3d 1087
22   (citing *Henderson v. Jantzen*, 719 P.2d 1322, 1323–24 (Or. Ct. App. 1986)).

     [103] *Snead*, 237 F. 3d at 1093 (citing *Smith v. Barton*, 914 F.2d 1330, 1340 (9th Cir. 1990)).

23   [104] *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000)
     citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220–22 (9th Cir. 1998)).

1  burden to show pretext using either direct or circumstantial evidence."[105]  "But when the plaintiff

2  relies on circumstantial evidence, that evidence must be 'specific and substantial' to defeat the

3  employer's motion for summary judgment."[106]  Shields points to several issues that she argues

4  prove pretext, but none of them—either individually or in the aggregate—are sufficient to meet

5  the "specific and substantial" standard and create a genuine dispute of material fact as to pretext.

6  ### A.    Temporal proximity

7  Both parties hone in on the temporal proximity of Shields's leave-extension request and

8  her discharge.[107]  Credit One contends that temporal proximity alone is insufficient to establish

9  pretext.[108]  Shields argues that Credit One's termination of her just four days after being notified

10  of her leave extension is indicative of pretext, and she notes that this close temporal proximity

11  "is a large part" of her argument that Credit One's elimination of her position was an effort to

12  "hide the fact that they were really terminating her because they didn't want to extend her leave

13  of absence."[109]  Considering temporal proximity as part of a causation inquiry may be

14  appropriate outside of the retaliation context.[110]  But courts tend to find that temporal proximity

15  alone, while sufficient to satisfy the relatively low-threshold showing of causation for a prima

16

17  [105] *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1094–95 (9th Cir. 2005) (citing *Godwin*, 150 F.3d at 1220).

18  [106] *Id.* at 1095 (quoting *Godwin*, 150 F.3d at 1222).

19  [107] ECF No. 76 at 17; ECF No. 81 at 21; ECF No. 82 at 15; ECF No. 88 at 10; ECF No. 91 at 9–10.

20  [108] ECF No. 76 at 17; ECF No. 82 at 15; ECF No. 88 at 10.

21  [109] ECF No. 81 at 20–21; ECF No. 91 at 9–10.

22  [110] *See, e.g.*, *Huck v. Kone, Inc.*, 539 F. App'x 754, 755 (9th Cir. 2013) (unpublished); *Murray v. Mayo Clinic*, 784 F. App'x 995, 998 (9th Cir. 2019) (unpublished).  Shields's operative complaint does not include a retaliation theory.  ECF No. 16.  In earlier proceedings in this

23  matter, Shields's counsel stated that she would be removing this theory prior to filing her amended (and currently operative) complaint because "there are not really any facts that stick out that would indicate retaliation."  ECF No. 15 at 7:9–19.

facie case, falls short of the "specific and substantial evidence" requirement at the pretext step of the *McDonnell Douglas* framework—especially when the proffered reason for the termination undermines the significance of the closeness in time. [111]

Viewed in isolation, the temporal proximity between Shields's leave extension and her termination four days later is short. But evidence consistent with both Credit One's proffered reason and the timing of its decision diminishes the significance of this closeness in time. Krutchik was in the process of implementing a number of changes in Shields's department at the time, which Shields does not dispute. [112] This process began before Shields went on leave and continued in her absence. [113] The record reflects an ongoing process taking place over the span of months, with two roles being eliminated (and one of these employees being terminated) in the two months that preceded Shields's own role being eliminated. [114] And before Shields even requested her initial leave, Krutchik brought on Riggs to streamline much of the work that Shields had been doing. [115] In light of this rich record of corporate reorganization at Credit One, the timing of Shields's termination does not support a specific and substantial showing of pretext.

Shields's own declaration also directly contradicts both her position on temporal proximity and the underlying premise of her entire case. [116] Shields avers that during her *initial*

---

[111] *Curley v. City of N. Las Vegas*, 772 F.3d 629, 634 (9th Cir. 2014); *Brown v. City of Tucson*, 336 F.3d 1181, 1187 (9th Cir. 2003); *Huck*, 539 F. App'x at 755.

[112] ECF No. 76-3 at 34:20–36:19.

[113] ECF No. 76-3 at 19:20–24, 20:14–25, 43:15–44:5; ECF No. 76-9 at 15:5–8, 20:9–22; ECF No. 76-10 at 3:2–10, 11:8–22, 14:12–17; ECF No. 76-11 at 3; ECF No. 76-12 at 17:4–12.

[114] ECF No. 76-3 at 43:15–44:5; ECF No. 76-11 at 3; ECF No. 76-12 at 17:4–12.

[115] ECF No. 76-12 at 3:23–5:22, 21:12–22:10. It appears that Krutchik may have also been actively reviewing Shields's role and duties. *See* ECF No. 76-3 at 48:23–50:16.

[116] *See* ECF No. 75-1 at 1–6.

17

leave of absence she was "denied Long Term Disability," which she believes happened because Credit One had already informed the insurance carrier that it planned on terminating her.[117]  But if that is true, then Credit One not wanting to extend her leave necessarily couldn't have been the reason she was discharged since it didn't learn of this extension until the very end of her initial leave period.[118]

### B.     Well wishes and flowers

Shields also highlights that while she was on leave she received flowers from her department after her biopsy was completed, as well as various communications from Credit One employees wishing her well, saying they anticipated her return, and congratulating her when her tests came back negative for cancer.[119]  According to Shields, this suggests that Credit One had not yet decided to terminate her since the messages did not "make any reference to an impending elimination of Shields['s] position or that she was no longer needed."[120]

This is a bizarre argument.  One would hardly expect communications of this type— congratulating Shields on not having cancer—to also contain information about her pending termination even if that decision had already been made.  There are countless reasons employers might not want to forecast such decisions to employees even under normal circumstances.  Even if I were to accept this as a logical inference, most of the messages Shields references date back

---

[117] ECF No. 75-1 at 3, ¶ 16.

[118] ECF No. 75-1 at 18.  I have made my findings here without relying on this belief, and Shields did not submit any evidence to support it.  But I do find it quite troubling that Shields might not actually believe the central throughline of her case and many of the arguments she is making on summary judgment.

[119] ECF No. 81 at 21–22; ECF No. 91:7–8.

[120] ECF No. 81 at 21–22; ECF No. 91:7–8.

to when she found out her tests came back negative in early May.[121]  So these messages would provide limited support for Shields's position, as Credit One could have made the decision to eliminate her position during the month and a half between that point and when Dr. Hillock extended her leave.  The only message that immediately preceded her leave extension was from Riggs, but she was not involved in the decision-making process related to the elimination of Shields's position.[122]  So the fact that the friendly communications that Shields received from her coworkers during her leave failed to mention her impending termination is not evidence of pretext.

### C.    Absence of certain documents

Shields next argues that "there is not one shred of written documentation from Credit One's files indicating that [Shields's] position was being eliminated before it happened," which she contends undermines Credit One's explanation that it eliminated Shields's position as part of departmental restructuring.[123]  But at the summary judgment stage a plaintiff must submit evidence to raise a genuine dispute of material fact—merely highlighting the absence of a certain type of document, without more, is insufficient.[124]  If, for example, Shields had presented evidence that the other personnel decisions made during this period were heavily documented leading up to their implementation, then that inconsistency might give rise to an inference that some other, unarticulated reason factored into the decision to eliminate Shields's position.  But Shields has offered no such evidence.

---

[121] *See* ECF No. 81 at 22.

[122] ECF No. 76-12 at 20:3–12.

[123] ECF No. 91 at 7.

[124] *See Celotex*, 477 U.S. at 322.

Shields also points to the fact that there "is no written documentation or other documentation to support that there was an ongoing restructuring plan like Credit One claims."[125]  But this argument suffers from the same fatal flaw.  Pointing to the absence of this one type of evidence is not enough when Credit One has presented substantial evidence that restructuring was occurring in some form, including evidence of terminations, hirings, the creation and elimination of positions, and various procedural changes, all being implemented over the months leading up to and during Shields's leave, and all starting with Krutchik's hiring.[126]  Shields does not dispute that these changes occurred.[127]  So the absence of documents related to restructuring does not create a triable issue of fact as to pretext.

### D.    Riggs's assumption of some of Shields's duties

It is undisputed that Riggs assumed some of Shields's duties when she initially went on leave and after her discharge.[128]  It appears that several other employees picked up some of her duties as well.[129]  Though Shields's arguments on this point are not entirely clear, she appears to contend that this is akin to hiring someone to replace Shields and thus also demonstrates that her discharge was pretextual.[130]

But there are several problems with this line of reasoning.  Shields largely focuses on Riggs, but Riggs testified that she, as the director of benefits, only took over Shields's

---

[125] *Id.*

[126] ECF No. 76-3 at 34:20–36:19.

[127] *Id.*

[128] ECF No. 76-12 at 12:18–22.

[129] *Id.* at 6:10–13, 23:19–25, 25:8–10.

[130] *See* ECF No. 81 at 21; ("[E]ven if Credit One didn't hire a Human Resources Generalist (as they claim) to replace Shields, they did replace the duties Plaintiff was performing by having Riggs (and possibl[y] Lago or others) perform the duties instead."); ECF No. 91 at 10 (same).

1  "benefits[- ]related" duties.[131]  Shields's duties related to "employee relations"  and equal-

2  employment-opportunity compliance were picked up by Lago,[132] and her accommodations-

3  related duties were handled by Yanez-Tourney.[133]  So the way Credit One distributed Shields's

4  duties is actually consistent with its stated reason for eliminating Shields's position—certain

5  processes were streamlined, and other duties were distributed among the department as part of a

6  shift towards increased specialization.

7       And even if Riggs really "took over the majority of Shields['s] job duties"[134] and was a

8  quasi-replacement for Shields, this would tend to undermine, rather than support, Shields's case.

9  Riggs was hired for her newly created role before Shields even knew she needed medical

10  leave.[135]  As Shields points out, Riggs was relatively new and had no duties of her own when

11  Shields went on leave.[136]  In fact, it appears that Riggs was largely shadowing Shields during

12  their two week overlap at Credit One.[137]  There is also uncontroverted testimony that Credit One

13  did not hire another human-resources generalist after Shields's discharge.[138]  But neither party

14  has submitted evidence that suggests someone else was later hired to backfill whatever other

15  duties Riggs would have been initially hired to perform prior to taking over Shields's benefits

16  duties if that, as Shields implies, had not been Credit One's initial intention.

17

18

---

[131] ECF No. 76-12 at 12:18–22.

[132] *Id.* at 23:24–25, 25:8–10.

[133] *Id.* at 6:10–13, 23:19–21.

[134] ECF No. 81 at 21.

[135] *See* ECF No. 75-1 at 14; ECF No. 76-3 at 20:14–18; ECF No. 76-9 at 20:9–22.

[136] ECF No. 81 at 21; *see also* ECF No. 76-12 at 16:21–24.

[137] ECF No. 76-12 at 9:1–10:9.

[138] *Id.* at 28:13–18.

### E.    February 2019 unemployment-benefit fax

Finally, Shields contends that a fax that Credit One sent to the employment-security division related to unemployment benefits[139] establishes that the true reason Credit One terminated her was because of her leave extension.[140]  This fax was sent more than seven months after Credit One terminated Shields.[141]  Its first two paragraphs lay out the timeline of her leave and extension requests.[142]  The third paragraph notes that her duties were divided and assumed by other HR employees during her absence and that, "as time passed, the department decided her position was no longer necessary."[143]  But nothing in this fax implies a causal link between her leave extension and discharge.  Nor is it inconsistent with Credit One's proffered reason for terminating Shields.  It is simply a short, post hoc summary of her medical leave and eventual termination.  So this fax doesn't support Shields's argument that her firing was pretextual.

### Conclusion

Because Credit One has shown a legitimate, nondiscriminatory reason for terminating Shields, and she has failed to submit specific and substantial evidence that its reason is mere pretext, I grant summary judgment for Credit One on Shields's claim.

IT IS THEREFORE ORDERED that Credit One's motion for summary judgment **[ECF No. 76] is GRANTED**, and Shields's motion for summary judgment **[ECF No. 75] is DENIED.**

---

[139] ECF No. 75-2 at 19.

[140] ECF No. 81 at 22–23; ECF No. 91 at 8–9.

[141] ECF No. 75-2 at 19.

[142] *Id.*

[143] *Id.*

**The Clerk of Court is directed to ENTER JUDGMENT in favor of the defendants and CLOSE this case.**

_____
U.S. District Judge Jennifer A. Dorsey
October 4, 2023